# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ANIKA PLESS**
**Plaintiff,**

**v.** **Case No. 25-C-1837**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration**
**Defendant.**

## DECISION AND ORDER

Plaintiff Anika Pless seeks judicial review of the denial of her application for social security disability benefits. Plaintiff alleged that she could not work due to mental impairments and hyper-mobility of her finger joints, but the Administrative Law Judge (ALJ) assigned the case concluded that plaintiff could perform a range of simple, medium exertion work, with "frequent" use of the hands. Plaintiff argues the ALJ erroneously omitted additional mental limitations proposed by agency psychological consultants, failed to support the conclusion that she could frequently work with her hands, and improperly discounted her statements about the intensity, persistence and limiting effects of her symptoms.

The ALJ prepared a detailed, 20-page single-spaced decision, thoroughly reviewing the evidence and adequately explaining her conclusions regarding plaintiff's capacity for work. Under the deferential standards applicable to judicial review of a disability determination, I affirm the ALJ's decision.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in April 2022, when she was 21 years old, alleging a disability onset date of February 1, 2022, based on anxiety, depression, Tourette's syndrome, obsessive-compulsive disorder (OCD), hyper-mobility, sleep disorder, attention-deficit hyperactivity disorder (ADHD), and autism. (Tr. at 82, 201, 230, 233.) In a function report, plaintiff stated that stress and anxiety made it difficult for her to leave the house. Her impairments also severely impacted her ability to manage time, stay organized, and avoid procrastination. Her ADHD made it difficult to stay focused and complete tasks. (Tr. at 242.) She needed to use alarms as reminders. Sensory issues affected her dress, and she needed reminders to bathe. (Tr. at 243.) She was able to cook simple meals and physically capable of housework, although she procrastinated. (Tr. at 244.) She was able to go out alone but rarely did due to anxiety. She was able to handle money and shop by computer. (Tr. at 245.) She did spend time with others, in person and texting. (Tr. at 246.) Plaintiff reported that her impairments affected memory, task completion, concentration, following instructions, and using her hands. She could pay attention for 10 minutes and found longer instructions overwhelming, but did OK with one task at a time. She generally got along well with authority figures. (Tr. at 247.) She handled stress terribly and required a long adjustment period to handle changes in routine. She endorsed unusual behaviors such as skin-picking, fidgeting/tics, pacing, and extreme sensory issues. (Tr. at 248.) Finally, plaintiff indicated her mother had to write her answers because she could not write legibly due to hyper-mobility in her hands. She did not believe she could live independently. (Tr. at 249.)

In a later function report, plaintiff reported that her impairments affected her ability to lift, walk, climb stairs, remember, complete tasks, concentrate, follow instructions, and use her hands. She noted poor physical conditioning because sensory issues made exercising difficult. (Tr. at 263.) She reported that she had tried volunteering at a wildlife sanctuary but was very anxious and no-showed a couple times. (Tr. at 265.)

Plaintiff also submitted a hand questionnaire, reporting that her handwriting was illegible, and she had to dictate her answers to her mother. Writing, gripping, and precision tasks were difficult; fatigue set in within five minutes, and she had below-average grip strength. (Tr. at 1384.) In a fatigue questionnaire, plaintiff reported that she could only handle one chore or task per day and needed a break after five to ten minutes of activity. She also needed a mental break after 10-15 minutes, getting distracted. (Tr. at 1385.)

Plaintiff further supported her application with reports prepared by her psychiatrist, Derek Carlson, M.D., and her therapist, Pamela Clough, LCSW. (Tr. at 309-15, 317-23, 1369-71, 1373-75.) Summarized, in these reports plaintiff's providers opined that she could not function independently outside the home, needed extra time to perform routine work tasks due to impaired concentration and high anxiety, and would be absent more than four days per month. (Tr. at 314, 322, 1371, 1375.)

The agency denied the application initially on March 23, 2023 (Tr. at 91, 117) based on the reviews of Gerard Chrabaszcz, M.D., who found no severe physical impairment (Tr. at 84), and Robert Barthell, Psy.D., who found a mild limitation in understanding, remembering or applying information, and moderate limitations in interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself (Tr. at 85-86). Dr. Barthell opined that plaintiff could do simple work for two hour periods in an eight-hour day with

adequate attention, concentration and pace, but could have occasional problems with prolonged concentration and sustained pace. Dr. Barthell noted that the evidence showed some difficulty with concentration and time management. He found plaintiff may occasionally have difficulty maintaining concentration on complex instructions of more than three steps and maintaining punctuality; however, for the most part, she had shown the ability to sustain a forty-hour workweek and complete one-to-two step tasks or commands. Dr. Barthell further opined that, due to her anxiety, plaintiff would do best in a position with limited public interaction. She could work near others but not directly with them. She should be capable of at least occasional interactions with the public with limited exposure to triggers. She could accept supervision and relate to coworkers if the contact was not frequent or prolonged; feedback should be supportive and non-confrontational, and she would benefit from low social demand in the workplace. (Tr. at 88.) Finally, Dr. Barthell opined that, while plaintiff had some difficulty dealing with unexpected changes, she was still able to adjust to occasional changes in tasks in jobs that generally involve doing the same simple tasks from day to day. She would do better in a job with a regular set of duties and expectations. (Tr. at 89.)

Plaintiff requested reconsideration (Tr. at 121), but on December 6, 2023 (Tr. at 92, 123) the agency affirmed the denial based on the reviews of Howard Atkins, Ph.D., and Dorothy Leong, M.D., who agreed with the previous assessments (Tr. at 94-95, 95-99). Plaintiff then requested a hearing before an ALJ. (Tr. at 149.)

**B. Hearing**

On October 8, 2024, plaintiff appeared with counsel for her hearing. The ALJ also called a vocational expert (VE) to offer testimony on jobs plaintiff might be able to do. (Tr. at 48.)

Plaintiff testified that she lived with her mother. She had completed high school and was

enrolled at Northeast Wisconsin Technical College but not then taking classes. (Tr. at 53.) She briefly attended UW-Milwaukee but had a hard time with dorm life and so switched to a more local school. (Tr. at 54, 66.) She was not sure how many credits she had earned. (Tr. at 54.) She took classes online, hoping to obtain an associate's degree in software development. Her only previous employment was a summer job as an office assistant in 2016 and 2017. (Tr. at 55.) She stopped that work due to feeling overwhelmed after just an hour on the job; she also experienced sensory issues, which made it difficult to wear work clothing. (Tr. at 56.)

Plaintiff testified that she took a number of medications, including Vyvanse, Sertraline, Buspirone, and Clonidine. (Tr. at 56-57.) She could tend to her personal needs, such as bathing and dressing, but needed reminders. She could make pasta, wash dishes (infrequently), and do laundry with instructions. She used the internet. (Tr. at 58.) She occasionally went to the mall with friends or to a convention, although she would need a break from the crowd. (Tr. at 59.) She attended occupational therapy (Tr. at 59) and treated with a psychiatrist and therapist (Tr. at 60).

Plaintiff testified that she struggled with formal clothing, which made her very uncomfortable. She also had a hard time with eye contact. She experienced anxiety when going out and had a low stress tolerance. (Tr. at 61.)

Plaintiff further testified that she had been unsuccessful in some of her classes, struggling to keep track of assignments and due dates. (Tr. at 62.) She also struggled with habits such as licking her lips and picking at scabs or acne, and with tics like compulsive movements. (Tr. at 62-63.) She had been able to take AP classes in high school because her parents were more involved in making sure she turned in assignments. (Tr. at 65.)

The ALJ then turned to the VE, asking a hypothetical question assuming a person of

plaintiff's age, education and experience, able to perform medium work with occasional climbing and postural movements, frequent handling and fingering, involving simple instructions, regular work duties with occasional changes, and occasional interaction with coworkers but no public interaction. (Tr. at 67-68.) The VE testified such a person could work as a hand launderer (14,000 jobs nationally), sweeper-cleaner/industrial (12,300 jobs), and lamination assembler (6000 jobs). (Tr. at 68.) At the light level, the person could work as a merchandise marker (46,000 jobs), inspector and hand packager (6000 jobs), or routing clerk (122,000 jobs). (Tr. at 68-69.) At the sedentary level, the person could work as a document preparer (9000 jobs), addresser (12,000 jobs), or slip sorter (6250 jobs). (Tr. at 69-70.) If the person were limited to occasional use of the hands, sedentary work would be eliminated; at the light level, the person could work as a cotton classer aide (2000 jobs) or bakery inspector (1500 jobs). (Tr. at 70-71.) There would be no medium jobs. (Tr. at 71.) The VE testified employers tolerate no more than 15% time off task and 12 absences per year. (Tr. at 71-72.)

**C. ALJ's Decision**

On January 28, 2025, the ALJ issued an unfavorable decision. (Tr. at 12.) Following the familiar five-step evaluation process,[1] the ALJ first determined that plaintiff had not engaged

---

[1]At step one, the ALJ determines whether the claimant has engaged in "substantial gainful activity" during the relevant period. 20 C.F.R. § 416.920(a)(4)(i). At step two, the ALJ considers whether the claimant has a "severe" medically determinable impairment. Id. § 416.920(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal one of the Listings. Id. § 416.920(a)(4)(iii). At step four, the ALJ considers whether the claimant can, given her residual functional capacity (RFC), perform her past relevant work. Id. § 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether, given her RFC, age, education, and work experience, the claimant can make an adjustment to other work. Id. § 416.920(a)(4)(iv). The claimant bears the burden of proof in each of the first four steps. The government bears the burden of proof at the fifth step and must present evidence establishing that the claimant can perform work that exists in a significant quantity in the national economy. Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011).

in substantial gainful activity since April 27, 2022, the application date. (Tr. at 17.) At step two, the ALJ found that plaintiff had the severe impairments of ADHD, Tourette's syndrome, OCD, anxiety disorder, autism spectrum disorder, panic disorder, and depression. (Tr. at 17.)

The ALJ considered plaintiff's writing impairment/hyper-mobility of the fingers but found that this condition caused no more than minimal limitation in her ability to perform basic work activities and was therefore non-severe. (Tr. at 17.) Plaintiff was evaluated for handwriting concerns while still in school, with the examiner noting extreme hyper-mobility through her finger joints, which contributed to her poor stability through her visual motor skills and handwriting. Plaintiff subsequently received occupational therapy and, with wrist splints, she exhibited decreased hyper-extension of digits and increased coordination and strength while completing fine motor tasks. Plaintiff submitted a questionnaire in support of her application, stating she had illegible handwriting and difficulty with gripping, grasping, and precision tasks. At recent occupational therapy appointments, plaintiff again raised concerns for hyper-mobility, decreased strength and endurance affecting distal coordination and abilities to perform daily tasks. On examination, she had grip strength of 43 pounds on the left and 45 pounds on the right.[2] However, she was able to perform her daily activities, including cooking, driving, brushing her teeth, unloading the dishwasher, and doing other chores as assigned, and on examination in October 2023 there was no evidence for a motor skill deficiency. (Tr. at 18.)

The ALJ also partially credited the opinions of the agency medical consultants that plaintiff's hyper-mobility was not a severe impairment. The ALJ found that any limitations associated with this condition were adequately addressed in the RFC for medium work with

---

[2]As plaintiff notes in her brief, this is considered weak for a female of her age. (Pl.'s Br. at 14 n.7.)

frequent handling and fingering. (Tr. at 18.)

At step three, the ALJ found that none of plaintiff's impairments met or equaled a Listing. (Tr. at 18.) The ALJ considered plaintiff's mental impairments under the criteria of Listings 12.04, 12.06, 12.10, and 12.11, which require one "extreme" limitation or two "marked" limitations in the four broad areas of mental functioning (i.e., the "paragraph B criteria"). (Tr. at 19.)

In the area of understanding, remembering, or applying information, the ALJ found that plaintiff had a mild limitation. While plaintiff reported problems with remembering, completing tasks, concentrating, and following instructions, her mental status examinations reflected good cognitive function with no persistent deficits in attention, concentration, or memory, average intellect/knowledge, and normal thoughts. Plaintiff also engaged in activities requiring her to understand, remember and apply information well, such as completing college level course-work, using the internet and managing money. (Tr. at 19.)

In the area of interacting with others, the ALJ assessed a moderate limitation. Plaintiff reported trouble in social settings, including difficulty understanding and responding to social cues; she also carried a diagnosis of autism spectrum disorder. However, she was able to engage in a range of activities requiring her to go out into the community; she maintained friendships; and providers consistently described her as having good eye contact and as being cooperative, demonstrating an ability to engage in appropriate social interaction. (Tr. at 19.)

With regard to concentrating, persisting, or maintaining pace, the ALJ found a moderate limitation. Plaintiff reported problems with concentration, attention, disorganization, task completion, low frustration and stress tolerance, obsessions/compulsions, rigidity, needing to do things in a certain way, and intrusive thoughts. (Tr. at 19.) However, she underwent a

psychological examination in October 2023, with the examiner stating that the unremarkable results suggested her ADHD was adequately managed. (Tr. at 19-20.) Other examinations evidenced no distractibility or deficits in attention or concentration; plaintiff reported good benefit from medications; and she reported some ability to perform her activities of daily living. (Tr. at 20.)

Finally, in the area of adapting or managing oneself, the ALJ also found moderate limitation. Plaintiff reported low tolerance for stress, change and frustration, problems regulating her emotions and her obsessions, compulsions and anxiety, and difficulties completing daily tasks. She required ongoing therapy and psychiatric medication management, and she participated in intensive outpatient programming from April to June 2022. However, plaintiff endorsed improvement following the intensive outpatient programming, as well as with occupational therapy and medication. In addition, examinations generally revealed appropriate mood, affect and appearance, good eye contact and cooperative behavior, and fair to intact insight and judgment. Moreover, plaintiff reported some ability to perform her activities of daily living and had completed college level course-work, albeit with some difficulty. Finally, plaintiff was diagnosed with "level I autism," which requires the lowest level of support. (Tr. at 20.)

Prior to step four, the ALJ found that plaintiff had the RFC to perform medium work, except that she was not able to climb ladders, ropes or scaffolds; was unable to work at unprotected heights and with hazards or dangerous machinery; and was able to frequently handle and finger. Mentally, she was able to understand, remember, and carry out simple instructions; she required regular work duties and expectations with occasional changes; and she was able to occasionally interact with coworkers and supervisors, but was not able to have public interaction. (Tr. at 20.) In support of this finding, the ALJ considered plaintiff's alleged

symptoms and the medical opinions. (Tr. at 21.)

The ALJ thoroughly reviewed plaintiff's symptoms as alleged in her function reports, hearing testimony, and the treatment notes. Plaintiff reported difficulties with lifting, using her hands, walking, climbing, remembering, completing tasks, concentrating, following instructions, and handling stress and change. She stated her ADHD and OCD severely affected her executive functioning, ability to manage time and tasks, prioritize, maintain focus, stay organized, and complete tasks in a timely manner. She also reported that she became quickly exhausted during social events. She further stated that she had poor dexterity and could not write legibly due to hyper-mobility in her hands. She could pay attention for ten minutes and did not finish what she started. (Tr. at 21.)

Regarding her daily activities, plaintiff reported that she had difficulties with taking her medications as prescribed, dressing, bathing, shaving, and eating due to sensory issues and needing reminders. She acknowledged that she could prepare simple foods to eat. She could do household chores but required reminders, encouragement, and instruction. She could go out alone but almost never did so because of anxiety and an inability to drive. She could shop by computer, pay bills, count change and handle a savings account but had never used a checkbook. She played video games, watched videos and television, and read. She reported that anxiety, panic, and ADHD interfered with her abilities to complete a job interview, take driving lessons and the driving test, and use public transportation. (Tr. at 21.) She wrote that she did not think she could live independently due to a need for constant reminders about medication, personal hygiene, and cleaning. (Tr. at 21-22.) She reported that she volunteered at a wildlife sanctuary but did not show a couple of times due to anxiety. (Tr. at 22.)

Plaintiff attended Northeast Wisconsin Technical College off and on since 2017,

receiving accommodations of extended time on examinations, a private room for testing, and the use of a computer for any written work. In her function report, plaintiff wrote that because of distractibility, anxiety, poor time management, and disorganization she had failed classes. (Tr. at 22.)

In a fatigue questionnaire, plaintiff wrote that she had difficulty with multiple chores and tasks or appointments in one day. She had to take rest breaks. She described mental and physical exhaustion with the performance of daily activities. She napped four to five times per week for multiple hours each time. She could not concentrate longer than ten to fifteen minutes and was easily distracted. (Tr. at 22.)

At the hearing, plaintiff testified that she had significant anxiety accompanied by somatic symptoms. She testified that she could tend to her personal care but required reminders. She was able to make pasta. She infrequently washed dishes and could do laundry with very specific instructions. She had difficulty vacuuming due to the noise. She was able to read, watch television, and use the internet. She did not shop or drive. She did not spend time with others very often, but she would go to the mall with friends. She had also attended conventions with her friends, but she took breaks during them due to the crowds. She reported sensory issues including wearing formal clothing and problems maintaining eye contact. She had a low stress tolerance. She had difficulty completing her online course-work due to her anxiety. She endorsed some tics such as finger tapping, licking her lips, and shrugging her shoulders. (Tr. at 22.)

Mental health and occupational therapy notes also documented plaintiff's symptom complaints. With respect to her ADHD, plaintiff reported that she procrastinated and had difficulty remembering to do things and problems focusing, concentrating and completing tasks.

Because of her OCD, she had problems with inflexibility and rigidity, needing things to be done in a certain order, and needing to have a fixed routine. Her depression caused feelings of worthlessness, low energy, and a tendency to isolate at times. Regarding her anxiety, plaintiff reported anxious behaviors like playing with her hair, fidgeting, picking and chewing on her fingers, problems tolerating stress, excessive worry, panic, and difficulty with sleeping. (Tr. at 23.)

From April to June 2022, plaintiff participated in intensive outpatient programming for management of debilitating symptoms relating to her OCD and anxiety. She reported difficulty completing activities of daily living due to ongoing moderate anxiety with some severe spikes and “freak outs.” Sleep was a challenge, but medications helped. Her mood was down and energy tended to be low. She reported needing better coping mechanisms and that social interaction/communication and time consuming tasks contributed to stress and feeling overwhelmed. (Tr. at 23.)

Plaintiff underwent a psychological examination in October 2023, reporting a diffuse pattern of cognitive difficulties with complaints of memory problems, low frustration tolerance, difficulties in attention and concentration, and less than adequate coping. She also related somatic complaints, a significant amount of emotional distress, excessive worry, and compulsive behaviors. She further reported feeling sad, unhappy and dissatisfied with her life circumstances, social withdrawal, and subjective feelings of incompetence. Finally, she reported not enjoying social events and avoiding social situations. Her diagnostic profile on testing supported diagnoses of ADHD, OCD, and generalized anxiety disorder. There was evidence of some depressive symptoms, but she did not meet the full diagnostic criteria for major depressive disorder. She also exhibited avoidant personality traits. (Tr. at 23.)

Plaintiff underwent psychological testing in December 2024 with the primary diagnostic concern being autism spectrum disorder. She reported needing reminders and encouragement for performing her daily activities. She described difficulties sleeping, struggling with self-motivation, task initiation and completion, and trouble handling change. She stated she was taking a break from her college level course-work to get her mental health in a good place. With respect to autism, plaintiff and her mother reported she tended to have repetitive speech, had difficulty understanding and responding to social cues, and had difficulty with implications. She reported repetitive motor movements like licking her lips, clearing her throat, and shrugging her shoulders. She reported having good friends that she texted with frequently, but that she had a hard time spending time with them. When she did spend time with them, she enjoyed it. She was very sensitive to sound, taste, and textures. (Tr. at 23.) The examiner stated that plaintiff was very friendly, sweet, and fun to engage with. She used more detailed terminology than typically seen, appeared anxious, and was somewhat self-deprecating. On standardized measure of intellectual functioning, she generally scored in the average range. The examiner concluded that plaintiff met the criteria for autism spectrum disorder level I, which is the category for individuals needing the lowest level of support. (Tr. at 24.)

As to her ongoing treatment, plaintiff had participated in counseling, psychiatric medication management, and occupational therapy for her sensory issues, executive functioning deficits affecting her independence in daily activities, and decreased grip strength/dexterity. To address plaintiff's Tourette's tics and non-severe hyper-mobility of her fingers with fatigue, the ALJ limited plaintiff to medium work, with no climbing of ladders, ropes or scaffolds, and no work at unprotected heights or with hazards and dangerous machinery. Her hyper-mobility of the joints and her sensory issues also required a limitation to frequent

handling and fingering. Because of plaintiff's mental health impairments and moderate limitation in concentration, persistence or maintaining pace, plaintiff was limited to simple instructions. (Tr. at 24.) Given the moderate limitation in adapting or managing, she required regular work duties and expectations with occasional changes. (Tr. at 24-25.) Because of her moderate restriction in interacting with others, she was able to occasionally interact with coworkers and supervisors but unable to have public interaction. (Tr. at 25.)

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. However, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 25.)

Plaintiff endorsed persistent symptoms associated with her mental health impairments that interfered to a work preclusive level with her cognitive and social functioning and abilities to perform daily activities. However, the ALJ concluded that her allegations regarding the degree of limitation associated with her symptoms could not reasonably be accepted as consistent with the overall medical evidence, including the objective clinical findings on mental status examinations, plaintiff's treatment history, and her activities. (Tr. at 25.)

Plaintiff's mental health examinations had been good, and she reported some improvement with treatment. While she did exhibit anxiety and irritability at some appointments, therapy notes from across the relevant period routinely documented open and cooperative behavior, appropriate appearance, normal mood, and appropriate affect. In support of this finding, the ALJ reviewed the treatment notes in detail. (Tr. at 25.)

At a November 2021 psychiatric medication management appointment, plaintiff reported that she was able to focus and concentrate throughout the school semester. She was taking

Adderall as needed, and it worked well when she took it. She did well in all her classes besides one. Sleep was good, she had motivation, and she did not feel depressed, sad, worthless or hopeless. She did not report concerns regarding tics or abnormal movements, and the examiner did not observe any. She had been doing well, managing her compulsions and interests well. She denied worry and anxiety and was looking forward to an upcoming trip. Her eye contact was good, and there were no problems with posture, muscle tone or strength. Her speech and language were intact, her mood was described as happy and stable, and her affect was congruent. She had no abnormalities in thought process or content. Her sleep and appetite were okay. Her attention, concentration, and memory were not problems. She was described as doing well, with no problems with activities of daily living. Her knowledge was in the average range, and her insight and judgment were good. (Tr. at 25.)

On the day of discharge from her June 2022 intensive outpatient programming, plaintiff exhibited steady and balanced psychomotor activities, normal speech, consistent eye contact, appropriate and cooperative behavior, neutral affect, and okay mood. Her thought process was logical and goal-directed. She was able to track conversation and answer questions appropriately. She recalled three of three items on immediate recall, her long term memory was intact, and she was able to focus. She had average intelligence as evidenced by her ability to understand and express herself appropriately and adequate fund of knowledge. Her insight and judgment were good. During the course of treatment, she was an active participant in group and individual therapy programming. (Tr. at 25.) She made good progress in changing cognitive and behavioral patterns. (Tr. at 25-26.) Her tics improved as her anxiety symptoms improved. She was pleasant throughout her treatment. (Tr. at 26.)

At a June 2022 psychiatric medication management appointment, plaintiff did not report

symptoms suggesting that she was more easily distracted, forgetful, or unable to complete tasks. She denied sadness, feelings of hopelessness or worthlessness, but reported low motivation for tasks she did not enjoy. She reported increased anxiety due to the exposure therapy she was going through and an upcoming medical procedure, and stated that social activities were hard. On examination, her physical appearance and eye contact were good, her speech and language were good, and there were no abnormal body movements. Mood was okay, although her affect was slightly nervous. Her attention and concentration for the most part were okay. (Tr. at 26.)

At her November 2022 psychiatric medication management appointment, plaintiff reported that she was motivated and had energy. She was depressed about the situation in Ukraine, but the feelings would pass. She reported she would twirl her hair when anxious, but denied other tics and the examiner did not observe tics during the visit. On examination, she had good eye contact and was very cooperative and engaged. She had normal speech and language; mood was reported as being more calm and stable, and affect was congruent; she had normal thought process and content; and focus and concentration were reported to be okay. She felt Vyvanse was working. (Tr. at 26.)

At her April 2023 psychiatric medication management appointment, plaintiff stated her tics were manageable. She was appropriately dressed, and her eye contact was very good. Her speech was good, and she expressed herself well. Her mood was stable and affect congruent, although she did report getting anxious. She did not exhibit deficits in thought processes, content, or association. She did have a preference for things to go a certain way, but it had not become an excessive or large problem. There was no psychomotor agitation, and she denied wanting to hurt herself. Concentration and focus were thought to maybe be a bit off, possibly

relating to anxiety. However, her mother denied seeing plaintiff as being in any way significantly more impulsive or hyperactive. There were no changes in terms of memory, insight, or judgment. Knowledge was in the average range. She had no problems with activities of daily living. (Tr. at 26.)

At an October 2023 psychological intake evaluation, plaintiff appeared in no distress, her mood was euthymic, her affect and speech were normal, her thoughts were coherent, logical and goal directed, her intellect was estimated to be average, her insight was good, and her judgment was intact though her psychomotor activity was increased. During testing performed that month, she had appropriate eye contact, relaxed posture, cooperative attitude, compliant behavior, and no tics. Her speech was normal. Her mood and affect were appropriate though her general range of affect was somewhat restricted. She rarely showed evidence of being distractible. Her intellectual functioning appeared to be within the average range, and her social skills were observed to be appropriate. Testing did not show her to have a disorder characterized by attention deficits. She had taken her medication, and the examiner stated that the unremarkable results suggested that her ADHD was adequately managed. At her November follow-up, plaintiff reported she felt OK, and she appeared euthymic with mood congruent affect. Her speech and psychomotor activity were normal; her thought process was coherent, logical and goal directed; and her insight was fair and judgment intact. (Tr. at 27.)

At her October 2023 psychiatric medication management appointment, plaintiff reported she was taking classes online and was not easily distracted. She was able to get her online work done for the most part. She denied increased disorganization. She reported she could handle changes, but she had been able to plan things out so that the changes did not occur frequently. She did report anxiety with problems sleeping and an increase in tics when anxious,

but denied feeling hopeless and stated her energy level and eating were OK. On examination, her memory was described as both intact and deficient. She was appropriately dressed with neat and clean hygiene/grooming, normal behavior, normal and cooperative attitude, normal sleep/appetite, no distress, average eye contact, normal posture and body movement, normal speech, euthymic mood and congruent affect, appropriate thought process and content, average cognition, appropriate activities of daily living, and good insight and judgment. (Tr. at 27.)

At her February 2024 psychiatric medication management appointment, plaintiff reported she was getting better with things not being perfect, becoming more flexible, and was not getting stuck on things although she had a preference for things to remain a specific way. She denied panic, feeling sad/down, and feeling hopeless, helpless, worthless or no good. Her tics were stable. On examination, she had normal posture, muscle tone, strength, and gait. Her eye contact was very good. She had some nervous repetitive habits, but they were not excessively on display. She had no problems with speech or language. There were no abnormalities with thought process, content, or association. She denied problems with sleep or appetite. She had no issues with immediate, recent or remote memory, and her insight and judgment were good. She denied problems with activities of daily living. The provider noted that she still had a tendency to put things off and that frequently included things that had a sensory component like emptying the dishwasher. But, when it came to her schoolwork, writing code for a college class, it was going well. (Tr. at 27.)

At her May 2024 medication management appointment, plaintiff reported that due to her symptoms, she had fallen behind in the college course she was taking, but she had reached out to her instructor and worked out a plan to get caught up. In terms of her OCD, while she

was still inflexible in that she had to do things in a certain order, she was not getting stuck on things. She was understandably sad over the loss of a pet cat and had low energy, but she was not feeling hopeless, worthless or no good. On examination, no abnormal body movements were observed; she had normal posture, muscle tone, strength, and gait; her eye contact was good; and she did not display motor tics or abnormal movements. Her speech was normal, her mood was improving following life stressors, and she had no abnormalities in thought process, content or association. Her provider noted that she did have a tendency to be somewhat rigid about doing things and her sleep was off, but she denied problems with focus and concentration, which were improving and coming back to baseline. There were no changes in behavior or concerns over insight, judgment or memory. Her activities of daily living were okay. (Tr. at 28.)

Finally, occupational therapy notes from 2024 documented slow but steady gains and more confidence in her ability to perform activities of daily living. Plaintiff was able to prepare simple recipes independently, tend to her personal care, and do chores. Moreover, she reported some ability to perform her activities of daily living at other appointments. She had also engaged in enjoyable activities like going to the Wisconsin Dells, to conventions and a flea market with friends, and the Shedd Aquarium, as well as volunteering at a wildlife sanctuary albeit on a limited basis. The record documented some difficulty with her college level course-work at times, but at other times plaintiff reported that her classes were going well and that she had demonstrated good self-advocacy skills with her professors. (Tr. at 28.)

The ALJ accepted plaintiff's assertion that her impairments caused symptoms and limitations, but the ALJ found that the objective medical evidence and other evidence of record was not consistent with the degree of limitation alleged. Given plaintiff's reasonably good

mental status examinations, the benefits from treatment, and her activities, the ALJ found that plaintiff was able to perform the medium, simple work set forth in the RFC. (Tr. at 28.)

The ALJ then turned to the medical opinions (Tr. at 28), considering first the reports from plaintiff's providers. Therapist Clough completed a questionnaire in August 2024, opining that plaintiff had marked to extreme deficiencies in understanding, memory, concentration, persistence, social interaction, and adaptation. She further opined that plaintiff would be absent about four days per month due to her impairments. The ALJ found this assessment not persuasive. While Ms. Clough observed and examined plaintiff over time and referenced symptoms in support of her opinion, her marked and extreme deficiencies and estimated absences were not supported by her own treatment notes and were not consistent with the other evidence of record. Ms. Clough's treatment notes routinely documented open and cooperative behavior, appropriate appearance, normal mood, and appropriate affect. Moreover, on examination with other providers, including at regular visits with her psychiatrist, plaintiff described improvement in her attention and concentration with medication, denied excessive tics, did not endorse significant depression, and reported only limited symptoms of anxiety, OCD and ADHD; her mental status examinations reflected good cognitive and social function with no persistent deficits in eye contact, judgment, insight, dress, attention, concentration, or memory with good benefit from medication, average intellect/knowledge, and normal thoughts. Finally, plaintiff acknowledged some ability to perform her activities of daily living on a consistent basis. Given plaintiff's response to treatment, her limited symptom reports, her good mental status examinations, and her ability to perform some daily tasks, the ALJ found plaintiff would not be absent four or more days per month. (Tr. at 29.)

Dr. Carlson also completed a questionnaire in August 2024, assigning moderate

deficiencies in understanding and memory and social interaction, but marked and extreme deficiencies in concentration, persistence and adaptation. He also opined plaintiff would be absent four days per month or more. The ALJ found this assessment of limited persuasive value. Dr. Carlson personally observed and examined plaintiff over the course of time. Further, the moderate limitation in social interaction had support in his treatment notes and was consistent with the other evidence of record. However, Dr. Carlson's moderate limitation in understanding and memory and his marked and extreme deficiencies in concentration, persistence and adaptation were not supported by his treatment notes or consistent with the record. Dr. Carlson, along with other providers, appreciated good cognitive function with no persistent deficits in attention, concentration or memory with good benefit from medication, average intellect/knowledge, fair to intact insight and judgment, and normal thoughts. Plaintiff was of average intellect per standardized testing. Moreover, she reported some ability to perform her activities of daily living. Finally, given plaintiff's benefit from medication, her limited symptom reports, her good mental status examinations, and her ability to perform some daily tasks, the ALJ found that she would not be absent four or more days per month. (Tr. at 29.)

Therapist Clough also issued an opinion in March 2022, stating plaintiff was not able to meet competitive standards across the mental abilities and aptitudes needed to do unskilled work, although she did allow that plaintiff had limited but satisfactory ability to interact appropriately with the general public and adhere to basic standards of neatness and cleanliness, and did not have problems maintaining socially appropriate behavior. She assigned plaintiff extreme limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. Ms. Clough also stated plaintiff had experienced four or more episodes of decompensation, she would be absent more than

four days per month, and her anxiety rendered her completely unable to function independently outside her home. Finally, Ms. Clough stated plaintiff had problems concentrating and remembering, severe anxiety, and problems completing daily tasks. (Tr. at 30.)

The ALJ found this assessment not persuasive. Ms. Clough's conclusions that plaintiff did not possess the mental abilities and aptitude for unskilled work and the extreme limitations across areas of functioning were not supported by her own treatment notes and were not consistent with the evidence of record. Again, Ms. Clough's treatment notes routinely documented open and cooperative behavior, appropriate appearance, normal mood, and appropriate affect. Further, treatment notes from other providers documented benefit from medication, no excessive ongoing tics, limited symptom complaints, and good cognitive and social functioning. Also, plaintiff reported some ability to perform her daily activities. Given plaintiff's benefit from medication, her limited symptom reports, her good mental status examinations, and her ability to perform some daily tasks, the ALJ found plaintiff would not be absent four or more days per month and did not have symptoms that rendered her unable to function independently outside her home. (Tr. at 30.)

Dr. Carlson also rendered an opinion in March 2022, stating plaintiff's anxiety rendered her unable to function independently outside of her home, and that she would be absent more than four days per month. He assigned no to mild limitations in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace, and one or two episodes of decompensation. He said she had limited but satisfactory abilities to understand, remember, and carry out very short and simple (as well as detailed) instructions and deal with the stress of skilled/semiskilled work, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and

cleanliness, maintain regular attendance and be punctual, ask simple questions, accept instructions and criticism, and get along with coworkers or peers without undue distraction. He assigned seriously limited but not precluded limitations in maintaining attention and concentration, sustaining an ordinary routine, working in coordination with or proximity to others without undue distractions, making simple work related decisions, keeping pace, completing a normal workday/week without interruptions from psychologically based symptoms, responding appropriately to changes, and dealing with normal work stress. (Tr. at 30.)

The ALJ found this assessment of limited persuasiveness. Insofar as Dr. Carlson's opinion assigned mild limitation in activities of daily living and moderate limitations in social functioning and concentration, persistence or pace, and concluded plaintiff could perform very short and simple instructions, interact with the public, and maintain regular attendance/be punctual, his assessment was supported by his own treatment notes and was consistent with the evidence of record. As discussed, Dr. Carlson's notes documented good eye contact, her therapist and others noted her to be cooperative or exhibit good social skills, she had friends, and she was able to go out into the community and engage in enjoyable social activities. Moreover, Dr. Carlson and other providers appreciated good cognitive function with no persistent deficits in attention, concentration, or memory with good benefit from medication, average intellect/knowledge, fair to intact insight and judgment, normal thoughts, and an overall ability to perform daily activities. The episode of decompensation was consistent with plaintiff's brief participation in intensive outpatient programming in 2022. However, Dr. Carlson's more serious limitations and his findings that plaintiff could not function independently outside of her home and that she would be absent more than four days per month were inconsistent with the good examination findings from Dr. Carlson and other providers, the benefits from treatment,

plaintiff's limited symptom reports at appointments with Dr. Carlson, and her ability to perform daily tasks. (Tr. at 31.)

The ALJ found the opinions of the agency consultants, Drs. Barthell and Atkins, somewhat persuasive. The consultants assigned a mild limitation in understanding, remembering, or applying information, and moderate limitations in the remaining paragraph B criteria. They stated plaintiff could do simple work for two hour periods in an eight-hour day with adequate attention, concentration and pace, but could have occasional problems with prolonged concentration and sustained pace. They noted the evidence showed some difficulty with concentration and time management. They found plaintiff may occasionally have difficulty maintaining concentration on complex instructions of more than three steps and maintaining punctuality, but that for the most part, she had shown the ability to sustain a forty-hour workweek and complete one-to-two steps or commands. They stated plaintiff would do best in a position with limited public interaction. They found she could work near others but not directly with them; she could accept supervision and relate to coworkers if the contact was not frequent, prolonged, or confrontational. She would benefit from low social demand and would have some difficulty dealing with unexpected changes but could adjust to occasional changes in jobs that involve doing the same simple tasks from day to day and jobs that have a regular set of duties and expectations. (Tr. at 31.)

The ALJ noted that Drs. Barthell and Atkins have disability program knowledge, and they supported their findings with reference to the mental health treatment records. Further, the mild to moderate limitations in the paragraph B criteria, and the conclusion that plaintiff could do simple work in a position with limited interaction with others and limited exposure to change, were consistent with the overall evidence of record. (Tr. at 31.) The mild limitation in

understanding, remembering or applying information was supported by plaintiff's good cognitive function on examination, her average intellect, and her daily activities (e.g., shop by computer, complete college level courses, and manage money). (Tr. at 31-32.) The moderate limitation in interacting with others and the determination that plaintiff should not have public contact appropriately balanced the reports of irritability, difficulties in social settings/social withdrawal and rigidity/inflexibility, with the evidence of her cooperative behavior and good eye contact across examinations, her friendships, and her activities taking her out into the community. Because of this evidence, however, the ALJ found plaintiff capable of occasional interaction with coworkers and supervisors. The moderate restriction in adapting or managing, with the conclusion that plaintiff could perform simple work with occasional changes, was consistent with the benefits plaintiff endorsed from treatment, her ability to perform some activities of daily living, and her good examinations. Finally, the moderate limitation in concentration, persistence or maintaining pace, with the conclusion that plaintiff could perform simple instructions and sustain adequate concentration, persistence and pace for two-hour periods in an eight-hour day and generally sustain a forty-hour work week, were consistent with the evidence showing that her attention and concentration issues were managed with medication, the examinations evidencing good cognitive function, the examinations showing no distractibility or deficits in attention or concentration, and her ability to perform daily activities. However, the consultants' finding that plaintiff was limited to one-to-two step tasks conflicted with this same evidence of good cognitive function. (Tr. at 32.)

At step four, the ALJ found that plaintiff had no past relevant work. (Tr. at 32.) Finally, at step five, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, as indicated by the VE, including hand launderer (14,000 jobs),

sweeper-cleaner/industrial (12,300 jobs), and lamination assembler (6000 jobs). (Tr. at 33.) The ALJ accordingly found plaintiff not disabled. (Tr. at 34.)

On September 15, 2025, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. at 1.) With the denial, the ALJ's decision became the final word from the agency on plaintiff's claim. See Poole v. Kijakazi, 28 F.4th 792, 794 (7th Cir. 2022). This action followed.

## II. DISCUSSION

### A. Standard of Review

A reviewing court will reverse the decision of an ALJ only if it is based on incorrect legal standards or unsupported by substantial evidence. Lincoln v. Bisignano, 173 F.4th 886, 891 (7th Cir. 2026); Yokosh v. Bisignano, 170 F.4th 631, 637 (7th Cir. 2026). The threshold for "substantial evidence" is not high, requiring only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Biestek v. Berryhill, 587 U.S. 97, 103 (2019). The court will not, under this deferential standard, re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination so long as substantial evidence supports it. Lincoln, 173 F.4th at 891. Put most simply, the court will reverse an ALJ's decision only if the record compels a contrary result. Thorlton v. King, 127 F.4th 1078, 1081 (7th Cir. 2025).

This does not mean the court simply rubber-stamps the ALJ's decision without conducting a critical review of the record. Padua v. Bisignano, 145 F.4th 784, 789 (7th Cir. 2025). An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Moy v. Bisignano, 142 F.4th 546, 552 (7th Cir. 2025). The ALJ must provide a

"logical bridge" from the evidence to her conclusions, Lincoln, 173 F.4th at 891, and may not ignore a line of evidence supporting a finding of disability, Thorlton, 127 F.4th at 1082. But the ALJ need not address every piece or category of evidence in the record, and the court reviews the ALJ's decision holistically to determine whether she grappled with evidence favorable to the claimant. Chrisman v. Bisignano, 137 F.4th 618, 624 (7th Cir. 2025); see also Warnell v. O'Malley, 97 F.4th 1050, 1053 (7th Cir. 2024) ("An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning."). Ultimately, all that is required is an explanation for how the evidence leads to the ALJ's conclusions that is sufficient to allow the reviewing court to assess the validity of the agency's conclusions and afford the claimant meaningful judicial review. Warnell, 97 F.4th at 1054.

**B. Plaintiff's Arguments**

**1. Agency Consultants' Opinions**

Plaintiff first argues that the ALJ should have included additional concentration/persistence and social interaction limitations recommended by the agency psychological consultants. (Pl.'s Br. at 7.) As indicated above, the ALJ found the consultants' opinions "somewhat persuasive," generally agreeing with their broad conclusions but declining to adopt all of the specific limitations they recommended. (Tr. at 31-32.)

**a. Concentration and Persistence Limitations**

The consultants found that plaintiff "may occasionally have difficulty maintaining concentration on complex instructions of more than 3-steps and maintaining punctuality; however, for the most part [she has] shown the ability to sustain a 40-hour workweek and

complete 1-2 step tasks or commands." (Tr. at 88, 98.) The ALJ found the consultants' assessment of a moderate limitation in concentration, persistence or maintaining pace, with the conclusion that plaintiff could perform simple work for two-hour periods and sustain a 40-hour workweek, consistent with the evidence showing that plaintiff's attention and concentration issues were managed with medication; the examinations evidencing good cognitive function, no distractibility, and no deficits in attention or concentration; and her ability to perform various daily activities. "However, their finding that [plaintiff] is limited to one to two step tasks conflicts with this same evidence of good cognitive function." (Tr. at 32.) Plaintiff argues the ALJ failed to adequately support this final conclusion. (Pl.'s Br. at 8.)

Plaintiff concedes that she often presented normally during medical appointments but argues the evidence shows she could not handle more complex tasks over an eight-hour workday and 40-hour workweek. She cites her statements that she became overwhelmed after just an hour at her previous office job, that she found longer instructions overwhelming, that she could do only one task at a time, and that she often took just one college class because it was all she could handle. (Pl.'s Br. at 8.) Plaintiff further cites Dr. Carlson's August 2024 opinion that she needed extra time to perform routine tasks due to impaired concentration, high anxiety, and need for reminders. (Pl.'s Br. at 9, citing Tr. at 1371.) Finally, plaintiff contends her daily activities are not inconsistent with a limitation to one-to-two step tasks, citing, e.g., the notations that she needed instructions and reminders to do laundry, bathe, and take medications. (Pl.'s Br. at 9.) Plaintiff concludes that the evidence of her executive functioning problems, tendency to get overwhelmed, and limited activities support the consultants' conclusion that she was capable of only one-to-two step tasks. (Pl.'s Br. at 9-10.) She faults the ALJ for failing to weigh this evidence and providing a cursory explanation for rejecting this additional limitation. (Pl.'s

Br. at 10.)[3]

The ALJ reviewed the medical record in detail, citing evidence that plaintiff was able to focus and concentrate throughout the college semester, and that her medication worked well (Tr. at 25, citing Tr. at 342); that she displayed logical and goal-directed thought processes, good recall and focus, and average intelligence (Tr. at 25, citing Tr. at 421); that she showed no abnormalities of thought process or content, and her attention and concentration were for the most part OK (Tr. at 26, citing Tr. at 549); that focus and concentration were OK, and medications worked (Tr. at 26, citing Tr. at 524); that her ADHD symptoms were adequately managed (Tr. at 27, citing Tr. at 592, 602); that she was not easily distracted and was able to get her online work done (Tr. at 27, citing Tr. at 597); that her course-work was going well, and she denied problems with activities of daily living (Tr. at 27, citing Tr. at 1163, 1665); and that she was able to reach out to her instructors and work out a plan to get caught up when she did fall behind in class (Tr. at 28, citing Tr. at 1651). During her most recent psychological testing, plaintiff spoke using advanced vocabulary, participated in back-and-forth conversation, and tested in the average range of cognitive functioning. (Tr. at 28, citing Tr. at 1709-1721.) Finally, the ALJ cited occupational therapy notes from 2024 showing slow but steady gains and more confidence in performing daily activities, including doing chores and preparing a multi-step recipe. (Tr. at 28, citing Tr. at 1499, 1632.) At other appointments, plaintiff reported engaging in activities such as taking trips out of state (Tr. at 28, citing Tr. at 342, 524), going to a

[3]Plaintiff contends the error is not harmless, as two of the three jobs the ALJ relied upon (hand launderer and lamination assembler) could not be performed with a limitation to one-to-two step tasks, and the third (sweeper-cleaner) does not alone exist in significant numbers. (Pl.'s Br. at 10-11.) Similarly, all but one of the light and sedentary jobs the VE referenced would also be eliminated with such a limitation, and the remaining job (bakery inspector) does not by itself exist in significant numbers. (Pl.'s Br. at 11.)

convention with friends (Tr. at 28, citing Tr. at 1632), visiting the Shedd Aquarium (Tr. at 28, citing Tr. at 643), and volunteering at a wildlife sanctuary (Tr. at 28, citing Tr. at 619, 621).

The ALJ acknowledged plaintiff's function reports and testimony suggesting greater limitations (Tr. at 21-22) but found those claims inconsistent with the objective medical and other evidence of record, including her reasonably good mental status examinations, the benefits from treatment, and her activities (Tr. at 28).[4] The ALJ also considered, but discounted, the opinions from Dr. Carlson (Tr. at 29-31), a finding plaintiff does not contest. The ALJ agreed that plaintiff's impairments caused symptoms and limitations, thus including a variety of mental restrictions in the RFC. (Tr. at 28.) However, the ALJ reasonably concluded that the objective medical and other evidence, including plaintiff's activities, controverted the claim that plaintiff lacked the ability to handle more complex tasks and function independently outside the home. In sum, the ALJ acknowledged most of the evidence plaintiff cites, and plaintiff fails to show that any of it compels a different result. See Morales v. O'Malley, 103 F.4th 469, 470 (7th Cir. 2024) ("It is not enough to criticize the ALJ's decision about her functional capacity to work. She must point to evidence compelling the conclusion that the adverse disability decision lacks substantial support in the record.").

In reply, plaintiff challenges the ALJ's reliance on normal examinations, which would not necessarily translate to full-time work. (Pl.'s Rep. Br. at 1-2.) Plaintiff cites Crump v. Saul, 932 F.3d 567, 571 (7th Cir. 2019), where the court contrasted the ability to pay attention in a doctor's office in the context of a structured, relatively short mental health examination, with the altogether different environment of a competitive workplace with sustained demands. However,

---

[4] I address below plaintiff's challenge to the ALJ's symptom evaluation.

the specific problem in Crump was the ALJ's reliance on a doctor's exam findings to discount that same doctor's opinion on the claimant's ability to sustain competitive employment. As courts in this circuit have noted, Crump does not hold that an ALJ may never consider a claimant's presentation at medical visits when evaluating her allegations. Martin D.M. v. Kijakazi, No. 22 C 5168, 2023 U.S. Dist. LEXIS 220874, at *23 (N.D. Ill. Dec. 12, 2023); see also Carol N.B. v. O'Malley, No. 22 C 6921, 2024 U.S. Dist. LEXIS 15134, at *18 (N.D. Ill. Jan. 29, 2024) (acknowledging Crump but holding that "an ALJ is not prohibited from considering a claimant's ability to concentrate during appointments as one part of her supportability analysis").

Plaintiff further argues in reply that the ALJ did not weigh evidence consistent with a restriction to one-to-two step tasks, e.g., her statements alleging difficulty following instructions and completing tasks, and Dr. Carlson's opinion. (Pl.'s Rep. Br. at 2.) But as discussed above, the ALJ found this evidence unpersuasive, and I cannot find reversible error in her failure to say more about its consistency with this particular limitation.

Finally, plaintiff argues in reply that her difficulties in completing daily activities were consistent with a limitation to one-to-two step tasks. (Pl.'s Rep. Br. at 2-3.) But the ALJ acknowledged these difficulties, and plaintiff's argument amounts to a request that the court re-weigh this evidence and substitute its judgment for the ALJ's, an impermissible step. Grotts v. Kijakazi, 27 F.4th 1273, 1278 (7th Cir. 2022).

**b. Social Interaction Limitations**

The consultants opined that plaintiff could "work near others, but not directly with them"; "would do best in a position with limited public interaction (i.e. working near, but not directly with the general public)"; and could "accept supervision and relate to coworkers if contact is not

frequent or prolonged. Feedback should be supportive/tactful/non-confrontational." (Tr. at 88, 98-99.) The ALJ found the consultants' moderate limitation in interacting with others and the determination that plaintiff should not have public contact appropriately balanced the reports of irritability, difficulties in social settings/social withdrawal, and rigidity/inflexibility, with the evidence of her cooperative behavior and good eye contact across examinations, her friendships, and the activities taking her out into the community. Based on this same evidence, however, the ALJ found plaintiff capable of occasional interaction with coworkers and supervisors, with no further limitation. (Tr. at 32.)

Plaintiff argues that the ALJ should have included limitations restricting the quality of her interactions with coworkers and supervisors, not just the quantity. (Pl.'s Br. at 12.) The Seventh Circuit has expressed skepticism about the distinction between quality and quantity of workplace interactions. See Reynolds v. Kijakazi, 25 F.4th 470, 474-75 & n.3 (7th Cir. 2022). In any event, the ALJ reasonably weighed the evidence in finding that, while plaintiff's social difficulties and rigidity/inflexibility would preclude public contact, her ability to interact appropriately with her medical providers, maintain friendships, and engage in enjoyable activities with friends and family in the community suggested she could handle at least occasional interaction with coworkers and supervisors (i.e., persons with whom she was more familiar). (Tr. at 32; see also Tr. at 19, further discussing plaintiff's social abilities.) The ALJ cited numerous pieces of evidence in support of this conclusion (Tr. at 32, citing Tr. at 331, 333, 342, 421, 517, 519, 524, 529, 532, 534, 535, 537, 541, 546, 547, 549, 587, 590, 592, 600, 602, 604, 608, 617, 619, 621, 623, 625, 631, 633, 636, 643, 646, 649, 1604, 1639, 1640, 1642, 1645, 1653, 1659, 1665, 1669, 1675, 1678), and a reviewing court may not re-weigh the evidence or substitute its judgment for that of the ALJ. See Pufahl v. Bisignano, 142 F.4th 446,

455 (7th Cir. 2025); Crowell v. Kijakazi, 72 F.4th 810, 818 (7th Cir. 2023). Plaintiff complains that the ALJ did not explain how the evidence supported her conclusion (Pl.'s Br. at 12-13), but I am able to trace the path of her reasoning on this issue. See Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985); see also Warnell, 97 F.4th at 1053 ("Time and time again, we have emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements.").

In reply, plaintiff argues the ALJ's reasoning was inconsistent, as she did not explain why plaintiff's symptoms supported a limitation on public interaction but not the other limitations the consultants recommended. (Pl.'s Rep. Br. at 3.) She further contends the ALJ merely summarized the evidence without explaining how it was weighed. (Pl.'s Rep. Br. at 3-4.) As indicated above, I am able to trace the ALJ's path of reasoning on this issue.[5]

**2. Manipulative Limitations**

Plaintiff next argues that the ALJ failed to support her conclusion that plaintiff could engage in frequent handling and fingering. (Pl.'s Br. at 13.) Plaintiff cites her reports of fatigue with using her hands, medical examinations noting hyper-extension of the finger joints, and therapy notes documenting decreased grip strength bilaterally. (Pl.'s Br. at 13-14.) The ALJ found that plaintiff's hyper-mobility was not a severe impairment, and that any limitations associated with this condition were addressed with an RFC for medium work with frequent handling and fingering. (Tr. at 18, 24.) Plaintiff argues that the ALJ merely summarized the

[5]To the extent plaintiff suggests in reply that the ALJ failed to comply with SSR 96-8p and 20 C.F.R. § 416.920c in evaluating the consultants' opinions (Pl.'s Rep. Br. at 1), any claim of legal error is waived. See Swiecichowski v. Dudek, 133 F.4th 751, 756 n.4 (7th Cir. 2025) ("[A]rguments raised for the first time in reply are waived."). In any event, the ALJ acknowledged the requirements of SSR 96-8p in determining RFC (Tr. at 17) and § 416.920c in evaluating the medical opinions (Tr. at 21). There was no legal error.

evidence, then asserted a conclusion, failing to provide adequate evidentiary support. (Pl.'s Br. at 14.)[6]

Plaintiff overlooks much of the ALJ's analysis of this issue.[7] The ALJ discussed the pertinent evidence in some detail, noting that plaintiff was evaluated for handwriting concerns while still in high school, with the examiner noting extreme hyper-mobility through her finger joints, which contributed to her poor stability and handwriting. Plaintiff subsequently received occupational therapy in 2020/2021, reporting that she would often demonstrate hyper-extension when completing tasks. However, with wrist splints and therapy, she exhibited decreased hyper-extension of the digits and increased coordination and strength while completing fine motor tasks. Her therapist observed that with bracing plaintiff demonstrated decreased hyper-extension of her digits and increased coordination and strength while completing motor tasks. The ALJ acknowledged the hand questionnaire plaintiff submitted in support of her application, reporting that she had illegible handwriting and difficulty with gripping, grasping and precision tasks. At occupational therapy appointments in 2024, plaintiff again raised concerns for hyper-

---

[6]Plaintiff contends the error is not harmless, for a limitation to occasional use of the hands would, per the VE, eliminate the medium and sedentary jobs, and leave just two light jobs that do not exist in significant numbers. (Pl.'s Br. at 14-15.)

[7]That most of this discussion came at step two is irrelevant. (See Pl.'s Rep. Br. at 4, noting that the Commissioner relied on this discussion.) The court considers the decision as a whole to determine whether the ALJ supplied a logical bridge connecting the RFC assessment to evidence in the record. McCorkle v. Kijakazi, No. 22-1638, 2023 U.S. App. LEXIS 919, at *9 (7th Cir. Jan. 13, 2023) (citing Moore v. Colvin, 743 F.3d 1118, 1121 (7th Cir. 2014)); see also Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("We do not discount [this discussion] simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant."); Orlando v. Heckler, 776 F.2d 209, 213 (7th Cir. 1985) ("[W]e examine the [ALJ]'s opinion as a whole to ascertain whether [she] considered all of the relevant evidence, made the required determinations, and gave supporting reasons for [her] decisions.").

mobility, with decreased strength and endurance affecting abilities to perform daily tasks and write. On examination, she had grip strength of 43 pounds on the left and 45 pounds on the right. However, the record revealed that plaintiff was able to perform her daily activities, including cooking, driving, brushing her teeth, unloading the dishwasher, and doing other chores as assigned, and on examination in October 2023 there was no evidence for a motor skill deficiency. (Tr. at 18.) The ALJ also partially credited the opinions of the agency medical consultants that plaintiff's hyper-mobility was not a severe impairment. (Tr. at 18.) The ALJ addressed plaintiff's subjective complaints and the evidence showing hyper-mobility by limiting plaintiff to medium work with frequent handling and fingering. (Tr. at 18, 24.)

In sum, the ALJ did more than merely summarize the evidence and assert a conclusion. She cited specific medical evidence showing improvement with courses of occupational therapy, as well as the opinions of the agency medical consultants who specifically considered this alleged physical impairment and found that it would have no more than a minimal effect on plaintiff's ability to work. (Tr. at 16, 18, 84, 94.) Importantly, plaintiff cites no medical opinion assessing manipulative limitations greater than the ALJ found. See Gedatus v. Saul, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is she offered no opinion from any doctor [setting limits] greater than those the ALJ set."); Best v. Berryhill, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004)).

In reply, plaintiff contends that, despite her failure to cite a medical opinion supporting greater limitations, the ALJ was still required to provide a logical bridge from the evidence to her conclusion that plaintiff could frequently handle and finger. (Pl.'s Rep. Br. at 4.) Plaintiff

cites Moy, 142 F.4th at 552, but the problem in that case was the ALJ's decision to account for the claimant's moderate limitations in concentrating, persisting, or maintaining pace by providing she could work at a consistent production pace. The Seventh Circuit saw "this as a non-sequitur: to accommodate Moy's moderate limitations, the ALJ treated her as if she were unlimited in those respects." Id. at 549. The ALJ committed no similar error of logic here. And, as discussed above, the ALJ provided a sufficient bridge from the evidence to her conclusion on this issue.

Plaintiff's argument also misunderstands her burden. As the Seventh Circuit noted in rejecting a similar argument that the ALJ failed to support the RFC:

> True, the ALJ did not point to evidence that Vang could perform light work. The ALJ did, however, weigh the evidence and conclude that the record did not support a determination that Vang could not work. Ultimately, it was Vang's burden, not the ALJ's, to prove that he was disabled. Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017). An ALJ adequately supports his RFC determination when he "consider[s] all limitations supported by [the] record evidence" and "tie[s] the record evidence to the limitations included in the RFC finding." See Jozefyk v. Berryhill, 923 F.3d 492, 497-98 (7th Cir. 2019).

Vang v. Saul, 805 Fed. Appx. 398, 401-02 (7th Cir. 2020). And as indicated above, on appeal, "[i]t is not enough to criticize the ALJ's decision about her functional capacity to work. She must point to evidence compelling the conclusion that the adverse disability decision lacks substantial support in the record." Morales, 103 F.4th at 470. Plaintiff fails to do so here.

**3. Symptom Evaluation**

Finally, plaintiff argues the ALJ failed to support her conclusion that plaintiff's symptoms were not as severe as alleged. (Pl.'s Br. at 15.) The ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these

symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 25.) Following a thorough review of the record, the ALJ accepted plaintiff's assertion that her impairments caused symptoms and limitations but found that the objective medical evidence and other evidence of record was not consistent with the degree of limitation alleged. Given plaintiff's reasonably good mental status examinations, the benefits from treatment, and her activities, the ALJ found that plaintiff was able to perform the restricted level of work set forth in the RFC. (Tr. at 28.)

Plaintiff first takes issue with the ALJ's reliance on daily activities, arguing that the ALJ merely summarized the evidence without explaining how she weighed it. (Pl.'s Br. at 15; Pl.'s Rep. Br. at 5.) She also cites caselaw criticizing ALJs for failing to appreciate the critical differences between activities of daily living and activities in a full-time job. (Pl.'s Br. at 16, citing Bjornson v. Astrue, 671 F3d 640, 647 (7th Cir. 2012).)

Summaries of the evidence are appropriate. Grotts, 27 F.4th at 1278. ALJs need not address every piece of evidence in the record and are prohibited only from ignoring an entire line of evidence contrary to their rulings. Id. Plaintiff makes no claim that the ALJ ignored favorable evidence here. Moreover, so long as the ALJ gives specific reasons supported by the record, the court will overturn a credibility determination only if it is "patently wrong." Id. at 1279; see also Hess v. O'Malley, 92 F.4th 671, 679 (7th Cir. 2024) ("We will overturn the ALJ's evaluation of a claimant's subjective symptoms only if it is 'patently wrong, which means that the decision lacks any explanation or support.'") (quoting Murphy v. Colvin, 759 F.3d 811, 816 (7th Cir. 2014)).[8]

[8]The regulations state that, in determining whether a claimant is disabled, the ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can

Plaintiff fails to make such a showing here. Again, I am able to trace the path of the ALJ's reasoning on this issue. The ALJ acknowledged plaintiff's reports of difficulties with certain tasks and chores but cited substantial evidence that plaintiff was able to engage in a variety of activities, e.g., attending college, volunteering at a wildlife sanctuary, and taking trips to conventions, undermining her claims of inability to handle more complex tasks and function independently outside the home. (Tr. at 28, citing Tr. at 535, 617, 1640.) The ALJ also cited specific occupational therapy records demonstrating slow but steady gains and more confidence in activities like preparing recipes, tending to her personal care, and doing chores. (Tr. at 28, citing Tr. at 1499, 1632.) The ALJ did not equate these activities with full-time work; instead, she contrasted them with plaintiff's claims of debilitating symptoms. See Brandt v. Saul, No. 20-C-1471, 2022 U.S. Dist. LEXIS 3320, at *49 (E.D. Wis. Jan. 7, 2022) (noting the critical difference between an ALJ improperly saying, "the claimant can perform this range of activities, therefore she can work," and an ALJ reasonably saying, "the claimant can perform this range of activities, therefore she can do more than she claims"); see also Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) ("[W]e have cautioned ALJs not to equate such

---

reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9. At the second step, the ALJ evaluates the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record, considering the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the claimant receives or has received for relief of the symptoms; and any measures other than treatment the claimant uses or has used to relieve the symptoms. Id. at *18-19. The ALJ followed the two-step process, and considered the appropriate factors, in the present case.

activities with the rigorous demands of the workplace. But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated.") (internal citations and quote marks omitted).

Plaintiff also takes issue with the ALJ's reliance on her treatment history, arguing the ALJ did not construct a logical bridge from this evidence to her finding that plaintiff's symptoms were not as severe as alleged. (Pl.'s Br. at 16; Pl.'s Rep. Br. at 6.) Plaintiff contends that her extensive efforts at relieving her symptoms should have lent support to her statements. (Pl.'s Br. at 17.)

Again, plaintiff makes no claim that the ALJ overlooked favorable evidence; rather, her claim is one of insufficient articulation. But again, I am able to trace the ALJ's path of reasoning from the evidence that plaintiff obtained some benefit from treatment to the conclusion that plaintiff's claims of totally disabling symptoms could not reasonably be accepted as consistent with the record. The ALJ acknowledged that plaintiff experienced difficulties and thus crafted an RFC with significant limitations addressing plaintiff's issues with concentration, adaptation, and social interaction. As the ALJ noted, however, the record contained evidence that plaintiff's ADHD symptoms were adequately managed with medication (Tr. at 27, 593), and occupational therapy notes showed slow but steady gains and more confidence in performing daily activities (Tr. at 28, 1499, 1632). Given this evidence, the ALJ's symptom evaluation cannot be deemed patently wrong. As the Seventh Circuit noted in rejecting a similar argument:

> [T]he record contains evidence that could be construed as favorable to Gedatus. But the ALJ noted some of that evidence and sided with her to a degree by determining she had severe impairments and needed some limitations on even "light" duties. This is not a case where an ALJ ignored evidence contrary to his conclusion. Despite her colorable arguments, we will not reweigh the evidence.

> She has not shown any reason to think the ALJ's summary or determinations are not supported by substantial evidence. Her "needless nitpicking"—the Commissioner's phrase—does not shake the conclusion that substantial evidence supports the ALJ's determination.

Gedatus, 994 F.3d at 901; see also Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) ("Where substantial evidence supports the ALJ's disability determination, we must affirm the decision even if reasonable minds could differ concerning whether the claimant is disabled.") (cleaned up).

Finally, plaintiff does not challenge the ALJ's reliance on her "reasonably good mental status examinations" in evaluating her symptoms. (Tr. at 28.) Even if the ALJ's reliance on the other factors was flawed in some respect, the court need "not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding." Schrank v. Saul, 843 Fed. Appx. 786, 789 (7th Cir. 2021); McKinzey v. Astrue, 641 F.3d 884, 890-91 (7th Cir. 2011) (affirming despite seeing some merit in two out of three challenges, where the claimant did not challenge the third reason for the credibility finding); see also Tutwiler v. Kijakazi, 87 F.4th 853, 859 (7th Cir. 2023) ("Although the ALJ might have erred in his analysis of some factors, enough of them had adequate supporting evidence for this court to uphold his credibility determination.").

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 6th day of August, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge